UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

EDWARD J. STEVENS,                )    SA CV 07-245 AHS(RNBx)
                                  )
                Plaintiff,        )
                                  )
        v.                        )    STATEMENT OF UNCONTROVERTED
                                  )    FACTS AND CONCLUSIONS OF LAW
MAVENT, INC., et al.,             )    IN SUPPORT OF PARTIAL SUMMARY
                                  )    JUDGMENT FOR DEFENDANTS
                Defendants.       )
_____    )

**I.**

**<u>INTRODUCTION</u>**

The Court, having read and considered the parties'
submissions and the record, issues this statement of the facts
which are uncontroverted or as to which there is no substantial
controversy, as well as the conclusions of law that follow
therefrom.  This statement is based on the submission of Mavent
Inc. and Mavent Holdings Inc. (collectively, "defendants" or
"Mavent") pursuant to Local Rule 56-1 in support of their Motion
for Partial Summary Judgment against Edward J. Stevens
("plaintiff" or "Stevens").

## II.

### UNCONTROVERTED FACTS

The following list identifies material facts as to which the Court finds there is no genuine issue to be tried.

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. In September 2003, Stevens began with Mavent as an at-will employee, holding the position of Chief Technology Officer and later, the position of Chief Information Officer. | Declaration of James A. Goodman ("Goodman Decl."), Deposition of Edward Stevens ("Stevens Depo.") 35:15-36:11, 52:24-53:15, 95:23-96:4; Declaration of Louis Pizante ("Pizante Decl.") ¶ 5. |
| 2. In 2003, 2004 and 2005, Stevens' base salary was $160,000 per year. | Stevens Depo. 60:4-23, 95:23-96:4. |
| 3. Stevens did not receive a bonus for fiscal year 2005. | Stevens Depo. 68:13-18. |
| 4. In approximately the third or fourth quarter of 2005, Tim Green ("Green"), Mavent's Chief Executive Officer ("CEO"), approached Stevens about signing an employment contract with Mavent. | Stevens Depo. 49:8-22, 50:3-20, 51:14-16. |

//

//

| | | |
|---|---|---|
| 5. | On or about January 30, 2006, Stevens signed an employment agreement ("Agreement") with Mavent, which stated that, among other things:  (1) Stevens' base salary would be $200,000 per annum; (2) he would receive a $115,000 signing bonus, to be paid by May 30, 2006; and (3) Stevens "shall be eligible to earn bonus compensation, in addition to [his] Base Salary (the "Bonus").  The Board shall annually set target, maximum and minimum goal thresholds for each quarter of the year, in its sole discretion, based on the Company's major business objectives." | Goodman Decl. ¶ 5, Exhibit 10, at Plaintiff 017, § 3(a). |
| 6. | From January 30, 2006 through the remainder of Stevens' employment at Mavent, the Board did not set target maximum and minimum goal thresholds as | Goodman Decl. ¶ 5, Exhibit 10, at Plaintiff 017, § 3(a)(iii); Pizante Decl. ¶ 47, Exhibit 123, at MAV 0101, ¶ 3; Complaint ("Compl.") ¶ 126, |

| | | |
|---|---|---|
| 1 | described in the | p. 19:14-19; Stevens Depo. |
| 2 | Performance Bonus section | 71:24-72:1; 72:11-13, |
| 3 | of the Agreement. | 72:17-73:1. |
| 4 | 7.   Stevens does not know the | Stevens Depo. 69:9-70:16, |
| 5 | criteria by which to | 70:17-24, 71:11-73:1. |
| 6 | determine whether he | |
| 7 | qualified or earned any | |
| 8 | quarterly performance bonus | |
| 9 | pursuant to the Agreement, | |
| 10 | nor does he know whether he | |
| 11 | actually qualified or | |
| 12 | earned the bonuses. | |
| 13 | 8.   On July 25, 2006, Green was | Pizante Decl. ¶ 12; Compl. |
| 14 | placed on a leave of | ¶ 74, p. 12:20-21; Stevens |
| 15 | absence and Louis Pizante | Depo. 182:11-183:2. |
| 16 | ("Pizante"), one of | |
| 17 | Mavent's senior executives, | |
| 18 | was appointed interim Chief | |
| 19 | Operating Officer ("COO"). | |
| 20 | 9.   Pizante had concerns about | Pizante Decl. ¶¶ 38, 39, |
| 21 | Stevens' job performance in | 49; Exhibit 123, at MAV |
| 22 | 2006 and believed that | 0101, ¶ 3 to MAV 0102, ¶ 1; |
| 23 | certain business decisions | Exhibit 39. |
| 24 | that Stevens made and | |
| 25 | vendor contracts he entered | |
| 26 | wasted Mavent's capital, | |
| 27 | personnel resources, and | |
| 28 | opportunity costs.  Those | |

1   decisions included the

2   following:

3   a.   Stevens invested in a

4        technology platform

5        which Pizante did not

6        believe was suited

7        for Mavent's business

8        goals.

9   b.   Stevens purchased

10       licenses from Oracle.

11       Pizante believed that

12       the amount of Oracle

13       licenses Stevens

14       purchased was

15       significantly more

16       than Mavent could use;

17       and thus, the excess

18       licenses were

19       unnecessary expenses.

20   c.  Stevens negotiated and

21       authorized

22       expenditures for AT&T

23       data center contracts

24       at a price which

25       Pizante believed was

26       significantly above-

27       market.

28   //

| | | | |
|---|---|---|---|
| 1 | 10. | On or about October 16, | Pizante Decl. ¶ 49; Exhibit |
| 2 | | 2006, Pizante wrote to | 123, at MAV 0101, ¶ 3 to |
| 3 | | Stevens, stating, "[g]iven | MAV 0102, ¶ 1. |
| 4 | | the disarray of the primary | |
| 5 | | technology initiatives, | |
| 6 | | including the cost of the | |
| 7 | | NG project and the | |
| 8 | | overspending on the Oracle | |
| 9 | | licenses and maintenance, | |
| 10 | | it would be unlikely that | |
| 11 | | you would have satisfied | |
| 12 | | these threshold criteria | |
| 13 | | and would therefore not be | |
| 14 | | eligible for a bonus | |
| 15 | | anyway." | |
| 16 | 11. | Stevens' second claim for | Compl. ¶¶ 149-153, 156-159, |
| 17 | | wrongful termination in | p. 23:22-28, 24:1-22, |
| 18 | | violation of public policy | 24:23-25:10. |
| 19 | | is based on the following | |
| 20 | | allegations: (1) in | |
| 21 | | violation of his right to | |
| 22 | | privacy, Mavent terminated | |
| 23 | | his employment because he | |
| 24 | | had personal conversations | |
| 25 | | with Green after July 25, | |
| 26 | | 2006; (2) in violation of | |
| 27 | | the First Amendment, Mavent | |
| 28 | | terminated his employment | |

| | | |
|---|---|---|
| 1 | because he had personal | |
| 2 | conversations with Green | |
| 3 | after July 25, 2006; and | |
| 4 | (3) in violation of Cal. | |
| 5 | Labor Code § 204, Mavent | |
| 6 | terminated his employment | |
| 7 | because he complained that | |
| 8 | he was not paid the | |
| 9 | adjusted salary, signing | |
| 10 | bonus and quarterly bonuses | |
| 11 | described in the Agreement. | |
| 12 | 12.  In 2006, Mavent was in need | Stevens Depo. 74:3-18, |
| 13 | of money and had | 75:2-5; Pizante Decl. ¶ 7. |
| 14 | significant cash flow | |
| 15 | challenges until it could | |
| 16 | complete some form of | |
| 17 | capital raise. | |
| 18 | 13.  In approximately March or | Stevens Depo. 73:8-74:18, |
| 19 | April 2006, Stevens agreed | 75:2-5; Pizante Decl., ¶ |
| 20 | with Green to defer payment | 18, Exhibit 120, at MAV |
| 21 | of a signing bonus until | 0096, ¶2; Goodman Decl., ¶ |
| 22 | Mavent completed its | 11, Exhibit 135, Response |
| 23 | capital raise. | to Interrogatory No. 8, p. |
| 24 | | 12:1-4; Answer ¶ 63:4-7. |
| 25 | | Goodman Decl., ¶ 11, |
| 26 | // | |
| 27 | // | |
| 28 | // | |

| | | |
|---|---|---|
| 14. | Stevens was told that once financing was completed, he would receive retroactive base salary adjustments for the period of January 1 through May 2006. | Exhibit 135, Response to Interrogatory No. 4, p. 8:4-11; Pizante Decl., ¶ 44, Exhibit 120, at MAV 0096, ¶ 2. |
| 15. | On July 25, 2006, Mavent informed its employees that Green was on a leave of absence, instructed employees not to communicate with Green about Mavent business matters, and told them that Green was not to have communication with Mavent clients, vendors or prospects, or Mavent employees or board members. | Stevens Depo. 182:11-183:2, 183:12-184:6, 207:17-25; Pizante Decl. ¶ 13. |
| 16. | Insurance Services Organization ("ISO"), a potential investor and a company that owns at least one subsidiary that competes with Mavent, expressed interest in investing capital in Mavent. | Pizante Decl. ¶ 23. |

| | | |
|---|---|---|
| 17. | Mavent's new Board Chair, Robert Huret ("Huret") asked that Stevens direct ISO to contact him, Huret, if ISO was interested in having a business relationship with Mavent. | Goodman Decl. ¶ 6, Exhibit 24; Stevens Depo. 190:9-25, 191:9-192:1. |
| 18. | In an email dated July 25, 2006, Huret wrote to Stevens to confirm his instructions to Stevens. The email states in part: | Goodman Decl. ¶ 6, Exhibit 24; Stevens Depo. 190:9-25, 191:9-192:1 |

> This will authorize you to discuss this topic with ISO and if they are interested in pursuing discussion further have them contact me in my capacity as Chairman of the Board of Mavent at the address below[.]

| | | |
|---|---|---|
| 19. | On July 25, 2006, Pizante became interim COO and as interim COO, became responsible for Mavent day-to-day operations and management. | Pizante Decl. ¶ 13. |

//

//

//

//

| | | |
|---|---|---|
| 20. | On or about July 27, 2006, after Green was placed on leave, Stevens informed Pizante that he and Green were trying to strike a venture capital deal with ISO. | Stevens Depo. 261:15-262:12, 263:6-264:3; Pizante Decl. ¶ 24. |
| 21. | During their conversation, on or about July 27, 2006, Stevens told Pizante that Huret had given Stevens permission to contact ISO to discuss a deal. | Stevens Depo. 261:15-262:12, 263:6-264:3; Pizante Decl. ¶ 24. |
| 22. | On or about July 27, 2006, Pizante contacted Huret to confirm Stevens' representation that Huret gave him the authority to deal with ISO and whether Stevens had been given such authority. | Pizante Decl. ¶ 26. |
| 23. | Huret responded to Pizante that Stevens did not have authority to negotiate any venture-capital deal with ISO, and that Stevens was only permitted to direct ISO's representatives to | Pizante Decl. ¶ 26. |

| | | |
|---|---|---|
| 1 | Huret to discuss any deal. | |
| 2 | 24. On July 27, 2006, at | Pizante Decl. ¶ 27, Exhibit |
| 3 | approximately 10:01 a.m., | 27; Stevens Depo. 203:4- |
| 4 | Huret sent Stevens an email | 205:4. |
| 5 | to confirm that there was | |
| 6 | no ambiguity in his | |
| 7 | instructions and reiterated | |
| 8 | to Stevens that he was only | |
| 9 | allowed to inquire into | |
| 10 | whether ISO was interested | |
| 11 | in Mavent and to direct ISO | |
| 12 | to speak with Huret.  The | |
| 13 | e-mail stated in part: | |

> The e-mail was and is intended to authorize you only to tell them to contact me directly if they want to have any discussions about their interest in the company.  [¶]  You are not authorized to do anything more than direct them to call me.

| | | |
|---|---|---|
| 21 | 25. One or two days later, on | Pizante Decl. ¶ 30, Exhibit |
| 22 | or about August 1, 2006, | 100. |
| 23 | Pizante was informed that | |
| 24 | Stevens continued to have | |
| 25 | discussions with ISO | |
| 26 | beyond simply directing its | |
| 27 | representatives to Huret. | |
| 28 | // | |

| | | |
|---|---|---|
| 26. | On or about August 1, 2006, Pizante asked Huret if he had permitted Stevens to engage in negotiations with ISO, and Huret responded: "I have repeatedly told Ed to have them call me if they have any interest in a conversation.  I have never given Ed the go ahead to have any discussions on his own." | Pizante Decl. ¶ 30, Exhibit 100. |
| 27. | When Green was placed on leave and Pizante was appointed interim COO, all Mavent employees, including employees who were Green's direct reports, were to report to Pizante. | Pizante Decl. ¶ 17; Stevens Depo. 195:21-196:23. |
| 28. | Stevens did not believe that he was required to report to Pizante, because his Agreement stated that Stevens was to report directly to the CEO and Pizante was not the CEO. | Stevens Depo. 195:21-196:2, 197:8-14, 197:23-198:20; Pizante Decl. ¶ 17. |

//

| | | |
|---|---|---|
| 29. | On or about July 28, 2006, Stevens told Pizante that pursuant to his Agreement, he was at all times to report to a CEO, and that he (Stevens) would not report directly to Pizante "because it was in conflict with [Stevens'] contract." | Stevens Depo. 195:21-196:2, 197:8-14, 197:23-198:20, 226:14-22, 227:5-10; Pizante Decl. ¶ 17; Goodman Decl., ¶ 7, Exhibit 33. |
| 30. | In approximately July and August 2006, Mavent employees complained to Pizante about their discontent and frustration with Stevens' attitude in the workplace and senior managers Lynette Hotchkiss, Angela Cheek, Scott McNulla, and Jason Connolly told Pizante that they would quit if Stevens remained at Mavent. | Pizante Decl. ¶ 37. |
| 31. | On August 19, 2006, Mavent placed Stevens on an administrative leave. | Stevens Depo. 244:6-15; Compl. ¶ 78, p. 13:1-2; Pizante Decl. ¶ 40. |

//

//

//

| | | |
|---|---|---|
| 1 | 32. | On or about August 21, | Pizante Decl. ¶ 41, Exhibit |
| 2 | | 2006, Stevens' leave was | 110. |
| 3 | | announced to Mavent's | |
| 4 | | employees and employees | |
| 5 | | were also instructed not to | |
| 6 | | contact Stevens while he | |
| 7 | | was on leave regarding | |
| 8 | | Mavent's business dealings. | |
| 9 | 33. | On approximately September | Pizante Decl. ¶¶ 42, 44, |
| 10 | | 6, 2006, Mavent obtained | Exhibit 120. |
| 11 | | from its investor, | |
| 12 | | Financial Technology | |
| 13 | | Ventures ("FTV"), the | |
| 14 | | capital funding it needed | |
| 15 | | to remain solvent and avoid | |
| 16 | | bankruptcy. | |
| 17 | 34. | On or about October 3, | Stevens Depo. 255:2-24, |
| 18 | | 2006, Pizante, as Mavent's | Pizante Decl. ¶ 44, Exhibit |
| 19 | | new CEO, asked Stevens to | 120. |
| 20 | | contact him to discuss his | |
| 21 | | return to Mavent. | |
| 22 | // | | |
| 23 | // | | |
| 24 | // | | |
| 25 | // | | |
| 26 | // | | |
| 27 | // | | |
| 28 | // | | |

| | | |
|---|---|---|
| 35. | On October 3, 2006, Pizante wrote to Stevens that capital funding was recently completed and, pursuant to his agreement with Green, would be paid his retroactive salary adjustment. | Stevens Depo. 255:2-24, 277:12-24, Pizante Decl. ¶ 44, Exhibit 120, at MAV 0096, ¶ 2. |
| 36. | On or about October 5, 2006, Stevens responded to Pizante's October 3, 2006, letter and said that he was ready to return to his duties. | Stevens Depo. 255:2-24, Pizante Decl. ¶ 45, Exhibits 120, 121. |
| 37. | In his October 5, 2006, letter to Pizante, Stevens asked for payment of quarterly bonuses and about Mavent's plans to address employee stock options. | Pizante Decl., ¶ 45, Exhibit 121. |
| 38. | On October 16, 2006, Pizante addressed Stevens' request to be paid quarterly bonuses, and explained: | Pizante Decl., ¶ 46, Exhibit 123. |

> [T]hese bonuses are based on threshold goals being met and exceeded and are to be established by the

| | | |
|---|---|---|
| | Board of Directors. The Board has not set those thresholds and therefore Mavent is unable to determine if you have satisfied the criteria to receive these bonuses. | |
| 39. | On October 20, 2006, Pizante told Stevens that Mavent was willing to buy out Stevens' employment agreement for $155,000 plus benefits, and if Stevens found this offer unacceptable, then he needed to return to work at Mavent. | Pizante Decl., ¶ 53, Exhibit 124; Stevens Depo. 255:2-24. |
| 40. | Stevens told Pizante that he did not accept the offer for a buy out and wanted to return to work. | Pizante Decl., ¶ 57, Exhibit 124; Stevens Depo. 255:2-24. |
| 41. | From approximately October 20 through October 25, 2006, Stevens and Pizante discussed Stevens' return to Mavent and some initial assignments Pizante asked Stevens to complete. | Pizante Decl. ¶¶ 54-54, Exhibits 39, 124. |

//

//

| | | |
|---|---|---|
| 42. | Mavent paid for Stevens' cell phone bill and in the October 2006 bill, Pizante learned that Stevens made calls to Green subsequent to Green's leave. | Pizante Decl. ¶ 51, Exhibit 39. |
| 43. | On October 21, 2006, Pizante asked Stevens to confirm that he had no communication with Green subsequent to July 25, 2006, after Green's leave. | Pizante Decl. ¶ 55, Exhibit 39. |
| 44. | On October 23, 2006, Stevens responded to Pizante's email that he was "happy to support" Pizante and that "the only communication I have had with Tim Green since he was placed on leave that would relate to Mavent or Mavent-related activities was on ISO opportunity, which Bob Huret and Mark Rapport approved." | Pizante Decl. ¶ 56, Exhibit 126, at MAV 0192 (e-mail dated October 23, 2006, time stamped 1:12 p.m.). |

//

//

//

| | | |
|---|---|---|
| 45. | On or about October 24, 2006, Pizante expected Stevens to start work on October 30, 2006. | Pizante Decl. ¶ 57, Exhibit 126, at MAV 0190 (email dated October 25, 2006, time stamped 10:37 a.m.) and MAV 0191 (email dated October 24, 2006, time stamped 10:42 a.m.). |
| 46. | In late October 2006, Pizante instructed Clare Stebbing, Mavent's General Counsel, and another Mavent employee, Paula Mooshagian, to access and print emails in Stevens' company email system. | Pizante Decl. ¶¶ 59, 61. |
| 47. | On October 29, 2006, Pizante spoke with and emailed Stevens, informing him that he should not return to the office on October 30, 2006, explaining that Mavent needed additional time to evaluate Stevens' status with the company in light of the recently discovered fact that Stevens had been in communication with Green | Pizante Decl. ¶ 63, Exhibit 40. |

| | | |
|---|---|---|
| 1 | after his being placed on | |
| 2 | leave and because Stevens | |
| 3 | did not follow Huret's | |
| 4 | directive that he not | |
| 5 | engage in negotiations with | |
| 6 | ISO. | |
| 7 | 48. In response, on or about | Pizante Decl. ¶ 64, Exhibit |
| 8 | October 30, 2006, Stevens | 41. |
| 9 | sent a letter to Pizante | |
| 10 | accusing Mavent of | |
| 11 | breaching the Agreement by | |
| 12 | failing to pay his signing | |
| 13 | bonus and back pay, among | |
| 14 | other things. | |
| 15 | 49. On or about October 31, | Pizante Decl. ¶ 65, |
| 16 | 2006, Mavent found certain | Exhibits 23 (with the |
| 17 | emails exchanges between | attachments to the email |
| 18 | Stevens and ISO, which | withheld to preserve |
| 19 | Stevens sent and received | confidentiality), 28, 29, |
| 20 | from his Mavent email | 30, 31, and 127. |
| 21 | address on Mavent's system. | |
| 22 | // | |
| 23 | // | |
| 24 | // | |
| 25 | // | |
| 26 | // | |
| 27 | // | |
| 28 | // | |

| | | |
|---|---|---|
| 50. | Among the emails Pizante saw on or about October 31, 2006, was an email dated July 24, 2006, from Stevens to Wayne Lattuca ("Lattuca"), ISO's Vice President of Business Development, wherein Stevens forwarded three attachments and a "Board Update." | Pizante Decl. ¶ 66(a), Exhibit 23 (with attachments to the email withheld to preserve confidentiality). |
| 51. | The attachments that Stevens forwarded to Lattuca on July 24, 2006, contained confidential Board information relating to Mavent's current negotiations with potential clients, financial information relating to Mavent, including expense and income calculations, and confidential information relating to Mavent's clients, their identity, their expected number of processed loans, and the price which Mavent | Pizante Decl. ¶ 66(a), Exhibit 23 (with the attachments to the email withheld to preserve confidentiality). |

| | | |
|---|---|---|
| 1 | charged them for processing | |
| 2 | each loan, among other | |
| 3 | things. | |
| 4 | 52. Among the emails Pizante | Pizante Decl. ¶ 67(a), |
| 5 | saw on or about October 31, | Exhibit 28. |
| 6 | 2006, was a chain of emails | |
| 7 | dated July 27, 2006, | |
| 8 | between approximately 5:18 | |
| 9 | p.m. and 5:32 p.m., between | |
| 10 | Stevens and Lattuca, where | |
| 11 | Stevens arranges to make | |
| 12 | another call to Lattuca and | |
| 13 | tells Lattuca that Mavent | |
| 14 | has the "same deal" with | |
| 15 | two of its clients, Fannie | |
| 16 | Mae and Freddie Mac. | |
| 17 | 53. Among the emails Pizante | Pizante Decl. ¶ 67(d), |
| 18 | saw on or about October 31, | Exhibit 30. |
| 19 | 2006, was an email dated | |
| 20 | July 29, 2006, from Stevens | |
| 21 | to Latucca, stating that he | |
| 22 | had bad news on valuation. | |
| 23 | // | |
| 24 | // | |
| 25 | // | |
| 26 | // | |
| 27 | // | |
| 28 | // | |

| | | |
|---|---|---|
| 1 | 54. | Valuation is a substantive | Pizante Decl. ¶ 67(d), |
| 2 | | issue in negotiations and | Exhibit 30. |
| 3 | | Pizante understood the July | |
| 4 | | 29, 2006 email to mean | |
| 5 | | that, after Huret told | |
| 6 | | Stevens to direct ISO to | |
| 7 | | negotiate with Huret, | |
| 8 | | Stevens substantively | |
| 9 | | discussed Mavent business | |
| 10 | | and shared investment- | |
| 11 | | related information with | |
| 12 | | ISO. | |
| 13 | 55. | Among the emails Pizante | Pizante Decl. ¶ 67(e), |
| 14 | | saw on or about October 31, | Exhibit 31. |
| 15 | | 2006, was an email dated | |
| 16 | | July 30, 2006, where | |
| 17 | | Stevens discussed with ISO | |
| 18 | | Mavent's current FTV deal. | |
| 19 | 56. | On or about November 6, | Pizante Decl., ¶ 68, |
| 20 | | 2006, Pizante, as CEO, sent | Exhibit 42. |
| 21 | | Stevens a Notice of | |
| 22 | | Termination, which outlined | |
| 23 | | the reasons for his | |
| 24 | | termination, stating, in | |
| 25 | | part: | |
| 26 | // | |
| 27 | // | |
| 28 | // | |

1    Based upon our review your
    communications and
2    interactions with ISO in
    July and August 2006, we
3    have concluded that you (i)
    disclosed highly
4    confidential business
    and financial
5    information to ISO in
    breach of your
6    contractual obligations,
    (ii) disregarded an express
7    direction from Mavent's
    Chairman of the Board
8    regarding the nature and
    extent of your
9    communications with ISO,
    and (iii) attempted to
10    mislead me and my staff in
    our efforts to review
11    communications with
    ISO.  We were not
12    aware of the depth of
    your communications
13    with ISO until you
    advised me you have
14    discussed ISO with Tim
    Green just a few days
15    ago while we were
    discussing the time of
16    your return to the
    Irvine office.

17

18    Pizante further explained:

19    In our review of this
    ISO situation, you
20    were given multiple
    opportunities to
21    discuss them with us
    candidly.  Instead you
22    attempted to mislead us as
    to the nature and extent of
23    your communications with
    ISO.  For example, you
24    stated emphatically
    that you had no
25    communications with
    ISO after July 27,
26    2006.  In fact, you
    continued to have
27    multiple emails
    communications (which also
28  //

| | | |
|---|---|---|
| 1 | refer to telephone conversations) with ISO | |
| 2 | personnel as discussed above.  You told me that | |
| 3 | you did not provide any documents or information to | |
| 4 | ISO when in fact you provided them highly | |
| 5 | confidential sales, financial, and customer | |
| 6 | information.  You also told me that Mr. Huret gave you | |
| 7 | oral permission to have substantive discussion with | |
| 8 | ISO after his written instructions authority you | |
| 9 | only to refer ISO to him if they had interest in a | |
| 10 | transaction with Mavent. Mr. Huret in no way gave | |
| 11 | you such permission. Accordingly, we further | |
| 12 | find that your lack of candor in this process also | |
| 13 | constitutes gross neglect. | |

| | | | |
|---|---|---|---|
| 14 | 57. | In Stevens' claims for | Compl. ¶¶ 188, 205, 206, p. |
| 15 | | fraud and negligent | 29:14-15, 32:24-27. |
| 16 | | misrepresentation, he | |
| 17 | | alleges that he was | |
| 18 | | fraudulently induced to | |
| 19 | | enter into the Agreement. | |
| 20 | 58. | Stevens testified that he | Stevens Depo. 279:15-20. |
| 21 | | did not know whether or not | |
| 22 | | he would have benefited | |
| 23 | | from declining to enter | |
| 24 | | into the Agreement; it | |
| 25 | | would be mere "conjecture." | |
| 26 | // | | |
| 27 | // | | |
| 28 | // | | |

| | | |
|---|---|---|
| 59. | In approximately the third or last quarter of 2005, when Green brought up the subject to Stevens of a new employment contract, Stevens told Green that he (Stevens) was not concerned about having a contract and that he was comfortable where he was at. | Stevens Depo. 48:8-22, 49:8-12, 50:3-20, 51:14-16. |
| 60. | When Green initiated discussions with Stevens regarding a new employment contract, Stevens was an at-will employee with a base salary of $160,000 per year. | Stevens Depo. 48:8-22, 49:8-12, 50:3-20, 51:14-16, 52:24-53:1, 60:4-60:23, 95:23-96:4. |
| 61. | In approximately late December 2005 or January 2006, Green provided Stevens with a draft shell employment contract, wherein Mavent offered to increase Stevens' base salary by $40,000 (from $160,000 to $200,000), and offered a signing bonus of $115,000. | Stevens Depo. 60:4-19, 62:11-63:5. |

| | | |
|---|---|---|
| 62. | Prior to receiving the offer of a $115,000 signing bonus from Green, Stevens was not expecting to receive any signing bonus. | Stevens Depo. 64:14-65:7. |
| 63. | Prior to receiving the offer of a $115,000 signing bonus from Green, Stevens had not asked for a signing bonus. | Stevens Depo. 64:14-65:7. |
| 64. | Stevens was paid a retroactive salary adjustment ($16,666.60) and signing bonus ($115,000). | Compl, ¶ 113, p. 17:11-12. |
| 65. | In Stevens' claims for fraud and negligent misrepresentation, Stevens alleges he was induced to return to California from Texas after he was suspended. | Compl. ¶¶ 185-188, 204-206, p. 29:5-16, 32:20-28. |
| 66. | Stevens testified that he is not aware of any false statements that any Mavent employee has made about him. | Stevens Depo. 274:8-12. |

//

//

| | | |
|---|---|---|
| 67. | In response to Interrogatories, Stevens alleges that Mavent defamed him through communications between Mavent's Board, describing conversations with Stevens and stating that they perceived Stevens' comments as "unflattering and/or inflammatory" as purportedly evidenced in "document MAV 1927." | Goodman Decl. ¶¶ 8 and 11, Exhibit 104, Exhibit 135 (Response to Interrogatory Nos. 21, 22, 23, 24 and 25.) |
| 68. | Document MAV 1927 is an email from Mike Issa, a third party, and not a Mavent employee. | Goodman Decl. ¶¶ 8 and 11, Exhibit 104, Exhibit 135 (Response to Interrogatory Nos. 21, 22, 23, 24 and 25); Pizante Decl. ¶ 8. |
| 69. | Stevens alleges that Mavent defamed him through communications between Pizante and the Board describing a dinner meeting with a senior executive of Inthernix, a competitor, where they discussed their dislike and lack of confidence in Stevens as | Goodman Decl. ¶¶ 11 and 9, Exhibit 135 (Response to Interrogatory Nos. 21, 22, 23, 24 and 25.), Exhibit 105. |

| | |
|---|---|
| 1 | purportedly evidenced in |
| 2 | "document MAV 1932," an |
| 3 | email written by Pizante. |
| 4 | 70.  Stevens alleges that Mavent | Goodman Decl. ¶ 11, Exhibit |
| 5 | defamed him through | 135 (Response to |
| 6 | communications between | Interrogatory Nos. 21, 22, |
| 7 | Mavent's Board that Stevens | 23, 24 and 25.). |
| 8 | received kickbacks on | |
| 9 | contracts. | |
| 10 | 71.  Stevens alleges that Mavent | Goodman Decl. ¶ 11, Exhibit |
| 11 | defamed him through | 135 (Response to |
| 12 | discussions among Mavent's | Interrogatory Nos. 21, 22, |
| 13 | management describing | 23, 24 and 25.), Exhibit |
| 14 | Stevens as "old school," | 105. |
| 15 | "stupid," "embarrassing," | |
| 16 | "the wrong guy for the | |
| 17 | job," or "dangerous." | |
| 18 | 72.  Stevens alleges that Mavent | Goodman Decl. ¶ 11, Exhibit |
| 19 | defamed him through | 135 (Response to |
| 20 | correspondence to the | Interrogatory Nos. |
| 21 | "'Irvine Users'" [Mavent | 21, 22, 23, 24 and 25.), |
| 22 | employees] that stated that | Exhibit 105; Pizante Decl. |
| 23 | Stevens was on | ¶ 41, Exhibit 110. |
| 24 | administrative leave and | |
| 25 | that he should not have any | |
| 26 | contact with employees, | |
| 27 | clients or prospects, | |
| 28 | regarding Mavent business. | |

| | | |
|---|---|---|
| 73. | In announcing Stevens' leave to Mavent employees, Pizante and the Board did not state the reason for his being placed on leave to Mavent employees. | Pizante Decl. ¶ 41, Exhibit 110. |
| 74. | Stevens alleges that Mavent defamed him by telling an individual, Mort Meyerson, that Stevens' employment was terminated. | Goodman Decl. ¶ 12, Exhibit 136 (Response to Interrogatory No. 1.). |
| 75. | Mavent is an FTV portfolio company, and Mort Meyerson was an advisor to Mavent and the CEO of FTV, a limited partner in the FTV funds and a member of the FTV advisory committee. | Deposition of Robert Huret ("Huret Depo.") Depo. 258:6-259:20. |
| 76. | Stevens alleges that Mavent defamed him through communication to ISO, wherein Mavent accused Stevens of disclosing highly confidential documents to ISO. | Goodman Decl. ¶ 11, Exhibit 130, Exhibit 135 (Response to Interrogatory No. 23), and Exhibit 136 (Response to Interrogatory No. 1). |

//

//

//

| | | |
|---|---|---|
| 77. | Pizante's November 7, 2006, letter to ISO did not accuse Stevens of disclosing highly confidential information but stated that the documents were "inadvertently" forwarded. | Goodman Decl. ¶ 11, Exhibit 130, Exhibit 135 (Response to Interrogatory No. 23), and Exhibit 136 (Response to Interrogatory No. 1). |
| 78. | Pizante's November 7, 2006 letter to ISO related to Mavent's business relationship with ISO, and ISO's potential investment of capital in Mavent. | Goodman Decl. ¶ 10, Exhibit 130. |
| 79. | Stevens asserts a cause of action for temporary restraining order and/or preliminary injunction to prevent Mavent from disbursing unvested stock options allegedly owed to him under the September 24, 2003, April 1, 2005 and December 15, 2005 Stock Option Agreements. | Compl. ¶¶ 240-242, p. 38:24-39:13. |

//

//

//

| | | |
|---|---|---|
| 80. | Stevens alleges that as a result of Mavent's alleged breach of his employment agreement and alleged wrongful termination of his employment, he is entitled to damages, including stock options, which would otherwise have been due to him. | Compl., ¶ 134, p. 21:1-4, ¶ 161, p. 25:16-19. |
| 81. | Under his Stock Option Agreements with Mavent, Stevens had until three months after the date of his termination to exercise his options. | Goodman Decl., ¶¶ 2 and 3, Exhibit 3 at Plaintiff 035, § 7; Exhibit 4 at MAV 0356, §7; Exhibit 7 at Plaintiff 093, § 7. |
| 82. | Stevens never exercised his options and the time within which to exercise his rights to stock options has expired. | Stevens Depo. 40:12-41:8, 42:10-17; Pizante Decl., ¶ 48, Exhibit 123. |
| 83. | Stevens prays for attorney's fees incurred in litigating his third claim. | Compl., Prayer for Relief, ¶ 11, p. 42:3-4. |
| 84. | Stevens received all of his wages on November 13, 2006. | Compl. ¶¶ 106, 107, 113, 114, 170, p. 16:18-21, 17:114-115, 26:23-26. |

//

| | | |
|---|---|---|
| 85. | On January 9, 2007, Stevens filed this action for recovery of penalties. | Compl. p. 1, ¶¶ 170-173, p. 26:23-27:6. |
| 86. | Stevens prays for attorney's fees incurred in litigating his first claim for breach of contract, third claim for violation of the California Labor Code, seventh claim under the UCL, and tenth claim for accounting. | Compl., Prayer for Relief, ¶¶ 3, 11, 21, 28, p. 41:8-10, 42:3-4, 43:8-9, 44:6-8. |
| 87. | The Agreement does not contain an attorney fee provision. | Goodman Decl., ¶ 5, Exhibit 10. |

### III.

### CONCLUSIONS OF LAW

**A.      Legal Standard**

        1.    Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  On a motion for summary judgment, "[t]he evidence of the opposing party is to be believed,

1  and all reasonable inferences that may be drawn from the facts

2  placed before the court must be drawn in the light most favorable

3  to the nonmoving party." Lindahl v. Air France, 930 F.2d 1434,

4  1436 (9th Cir. 1991). A court is entitled to rely on the nonmoving

5  party to identify with reasonable particularity the evidence that

6  precludes summary judgment. See Keenan v. Allan, 91 F.3d 1275,

7  1279 (9th Cir. 1996).

8  **B.       First Claim for Breach of Contract**

9           **(i)   Non-payment of Performance Bonuses**

10         2.   A claim for breach of contract requires evidence of

11  (1) the contract's existence and its terms, (2) performance by

12  plaintiff, (3) breach by defendants, and (4) damages suffered by

13  plaintiff as a result. MacDonald v. John P. Scripps Newspaper, 210

14  Cal. App. 3d 100, 104 (1989). "Under basic contract law an offer

15  must be sufficiently definite, or must call for such definite terms

16  in acceptance that the performance promised is reasonably certain."

17  Ladas v. Cal. State Auto. Assoc., 19 Cal. App. 4th 761, 770 (1993).

18         3.   The contractual promise to plaintiff to pay him

19  performance bonuses is too vague and indefinite to enforce. An

20  employee's "eligibility for bonus payments is properly determined

21  by the bonus [plan's] specific terms and general contract

22  principles." Neisendorf v. Levi Strauss & Co., 143 Cal. App. 4th

23  509, 523 (2006). "California courts have consistently

24  characterized bonus and profit sharing plans as constituting an

25  offer of the stated benefits in exchange for the service of an

26  employee, and upon the employee's completion of the required

27  services in accordance with the terms of the plan, a binding

28  contract is formed under which the employer is obligated to deliver

1  the promised benefits." Id. (emphasis omitted).

2  　　　　4.  "Courts will not enforce vague promises about the

3  terms and conditions of employment that provide no definable

4  standards for constraining an employer's inherent authority to

5  manage its enterprise.  It is to be expected that many alleged

6  employer promises will be unable to cross this threshold of

7  definition to become enforceable contract claims." Scott v.

8  Pacific Gas & Electric Co., 11 Cal. 4th 454, 473 (1995),

9  disapproved on other grounds, Guz v. Bechtel Nat. Inc., 24 Cal. 4th

10 317, 352 n.17 (2000); see also Rochlis v. Walt Disney Co., 19 Cal.

11 App. 4th 201, 213 (1993) (stating that contractual promises,

12 including those to award performance bonuses, will not support a

13 breach of contract claim if they are "simply too vague and

14 indefinite to be enforceable"), overruled on other grounds, Turner

15 v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1251 (1994); Ladas, 19

16 Cal. App. 4th at 767-68 (finding promise to "maintain a

17 compensation parity in keeping with industry standards" too vague

18 to be enforceable).

19 　　　　5.  Although the parties' Agreement in the instant case

20 allowed for the possibility of performance bonuses, the terms for

21 attaining such bonuses were to be determined entirely at

22 defendants' "sole discretion," based on its "major business

23 objectives."  Defendants did not set conditions for the awarding of

24 bonuses.  Accordingly, Plaintiff's first claim for breach of

25 contract based on defendants' alleged failure to pay quarterly

26 performance bonuses fails as a matter of law because the promise to

27 pay quarterly performance bonuses contained in the Agreement has no

28 definable standards and is too indefinite to enforce.

6.   Plaintiff's first claim for breach of contract for failure to pay performances bonuses fails because the absence of standards for determining performance bonus eligibility renders damages speculative.  <u>Scott</u>, 11 Cal. 4th at 473 ("It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery."  (internal quotations omitted)).

7.   <u>Sabatani v. Hensley</u>, 161 Cal. App. 2d 172, 175 (1958), cited in opposition by Plaintiff, has not been overruled, but more recent California cases, including <u>Ladas</u>, <u>Neisendorf</u>, <u>Scott</u>, and <u>Rochlis</u>, together evidence a departure from <u>Sabatani</u>'s approach to indefinite contractual terms.  <u>Scott</u>, decided by the California Supreme Court, cites to <u>Ladas</u> and <u>Rochlis</u> approvingly for the proposition that vague and indefinite contractual promises in the employment context are unenforceable.  <u>Scott</u>, 11 Cal 4th at 472-73.  <u>Scott</u> justified its conclusion, in part, on the principle that only the violation of clear contractual terms should invite judicial intervention into an employer's "inherent authority to manage its enterprise."  <u>Id.</u> at 473.

8.   California courts would likely apply the more recent case law in this case since the Agreement's provision regarding performance bonuses is closely tied to defendants' "inherent authority to manage [their] enterprise."  <u>Scott</u>, 11 Cal. 4th at 473.  The provisions of the Agreement grant defendants "sole discretion" to set the determinative criteria because the performance bonus amounts were to derive directly from defendants' determination of their "major business objectives."

**(ii)      Equitable Estoppel**

9.   "[F]our elements must be present in order to apply the doctrine of equitable estoppel: (1) the party must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." Driscoll v. City of Los Angeles, 67 Cal. 2d 297, 305 (1967) (internal quotations omitted).

10.   Plaintiff's assertion of equitable estoppel fails as a matter of law because the undisputed facts establish that plaintiff entered into the Agreement on January 30, 2006, knowing the performance bonuses' issuance was conditioned on defendants' setting the relevant criteria.  Plaintiff argues in his opposing papers that defendants' failure to pay performance bonuses caused him "substantial financial loss" and "undue hardship," but he identifies no particular evidence of financial loss except for that incurred in voluntarily initiating this litigation and not exercising stock options.  (See Opposition, at 15).

**C.      Second Claim for Wrongful Termination in Violation of Public Policy**

11.   "To recover in tort for wrongful discharge in violation of public policy, the plaintiff must show the employer violated a public policy affecting society at large rather than a purely personal or proprietary interest of the plaintiff or employer.  In addition, the policy at issue must be substantial, fundamental, and grounded in a statutory or constitutional provision." Holmes v. General Dynamics Corp., 17 Cal. App 4th

1418, 1426 (1993).  There must be a "nexus" between the protected
activity and the allegedly adverse treatment to support plaintiff's
claim.  <u>Id.</u> at 1258.

### (i)      Right to Privacy

12.  Plaintiff's second claim for wrongful termination in
violation of public policy fails as a matter of law because the
undisputed facts establish, and Plaintiff concedes, that the right
to privacy is not a fundamental public policy that supports the
tort in this case.  <u>Luck v. Southern Pacific Transportation Co.</u>,
218 Cal. App. 3d 1, 28-29 (1990) (holding that the right to privacy
is a "private right, not a public one," and accordingly, does not
support a cause of action for wrongful termination in violation of
public policy).

### (ii)     First Amendment

13.  Plaintiff's second claim for wrongful termination in
violation of public policy also fails as a matter of law because
the undisputed facts establish, and plaintiff concedes, that the
First Amendment is not a fundamental public policy that supports
the tort in this case.  See <u>Grinzi v. San Diego Hospice Corp.</u>, 120
Cal. App. 4th 72, 80-81 (2004) (holding that the First Amendment,
because it "expresses a guarantee only against action taken by the
government," does not support a cause of action for wrongful
termination in violation of public policy in the context of private
employment).

### (iii)    Cal. Labor Code § 204

14.  In order to establish a prima facie case of wrongful
discharge in violation of public policy, Plaintiff must show there
is a causal connection between the protected activity he sought to

exercise and the employer's action.  See Flait v. North American Watch Corp., 3 Cal. App. 4th 467, 476 (1992).  Once plaintiff establishes a prima facie case, it falls to defendants to articulate a legitimate, non-retaliatory reason for their decision to terminate plaintiff.  See Akers v. County of San Diego, 95 Cal. App. 4th 1441, 1453 (2002).  If defendants produce a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to prove intentional retaliation by offering evidence of retaliatory intent or by demonstrating defendants' reasons are pretextual.  Id.  Plaintiff can do so via direct or circumstantial evidence.  "Direct evidence of retaliation may consist of remarks made by decision-makers displaying a retaliatory motive."  Iwekaoqwu v. City of Los Angeles, 75 Cal. App. 4th 803, 816 (1999).  "Circumstantial evidence typically relates to such factors as plaintiff's job performance, the timing of events, and how [plaintiff] was treated in comparison to other workers."  Colarossi v. Coty U.S. Inc., 97 Cal. App. 4th 1142, 1153 (2002).

        15.  As the California Labor Code reflects, and defendants concede, public policy favors the timely payment of wages due an employee.  See Cal. Labor Code § 204; see also Phillips v. Gemini Moving Specialists, 63 Cal. App. 4th 563, 571 (1998) ("One need only examine provisions in the Labor Code to realize that the prompt payment of wages due an employee is a fundamental public policy of this state." (internal quotations omitted)); Pressler v. Donald L. Bren Co., 32 Cal. 3d 831, 837 (1982) ("Public policy has long favored the full and prompt payment of wages due an employee." (internal quotations omitted)).

16.   Plaintiff contends he was wrongfully terminated in retaliation for demanding prompt payment of compensation owed to him.  The undisputed facts show that, even assuming Plaintiff has set forth a prima facie case of retaliation, defendants have provided a legitimate, non-retaliatory business justification for plaintiff's termination: specifically, that plaintiff disclosed what defendants perceived to be confidential information to ISO, a potential investor and parent company to defendants' competitors, and that he violated directives from defendants to not communicate with ISO.

17.   Plaintiff has not demonstrated a triable issue of pretext.  He argues, based on circumstantial evidence, that the stated business reasons for his termination are not credible in light of the fact that the confidential disclosures he made to ISO were authorized by defendants' former chief executive officer and that defendants had a nondisclosure agreement with ISO which would have prevented the any misuse by ISO of the disclosed information. Plaintiff also claims, *inter alia*, that he was authorized by defendants' board members to remain in communication with ISO.

18.   The evidence, however, would not permit a reasonable jury to conclude that there exists a causal nexus between plaintiff's request for owed compensation and his termination.  It is undisputed that plaintiff agreed to have his signing bonuses and salary increase postponed until Mavent acquired the requisite capital funding.  The undisputed facts also establish that defendants intended to, and eventually did pay, plaintiff the retroactive wages and signing bonus owed to him.  Defendants made clear their intent to pay plaintiff his signing bonus and

outstanding compensation in correspondence to plaintiff asking him to return to work; this was prior to plaintiff responding and demanding payment for his performance bonuses.  Lastly, plaintiff's argument that he was terminated for demanding payment of compensation owed is undermined by the undisputed fact that defendants paid plaintiff his signing bonuses and owed adjusted salary, even after terminating him.

19.   The performance bonuses are not properly considered "wages" as defined in the Labor Code, which serves as the undergirding public policy in this claim, because the terms and conditions by which the bonuses would be earned were not set.  See Neisendorf, 143 Cal. App. 4th at 522.  California Labor Code § 204 thus is not inclusive of these unpaid amounts and his claim cannot be supported on this basis.

**D.        Fourth Claim for Fraud and Fifth Claim for Negligent Misrepresentation**

20.   "The elements of fraud which give rise to the tort action for deceit are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).

21.   Unlike a claim for fraud, the tort of negligent representation does not require scienter or intent to defraud.  See Small v. Fritz Co., Inc., 30 Cal. 4th 167, 173-74 (2003).  "It encompasses the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true, and the positive assertion, in a manner not warranted by the

information of the person making it, of that which is not true, though he believes it to be true." Id.

22.  Plaintiff's fourth claim for fraud fails as a matter of law because the undisputed facts establish that plaintiff has no evidence that anyone at Mavent intended to defraud plaintiff in inducing him to enter into a written employment agreement on January 30, 2006, or that when Pizante told plaintiff that Mavent wanted him to return to work in October 2006, Pizante intended to defraud plaintiff.  The undisputed facts establish defendants intended to have plaintiff resume his duties when they asked him to return after having been placed on administrative leave.

23.  Plaintiff alleges defendants intentionally misrepresented to him that he would receive a signing bonus and unpaid adjusted salary, but the undisputed facts show plaintiff agreed to defer these payments until defendants acquired additional capital.  Plaintiff additionally contends Pizante intentionally misled him when, in his October 3, 2006 letter, Pizante stated plaintiff would "now" receive the signing bonus and unpaid adjusted salary, since plaintiff did not receive these sums until after he was terminated.  Pizante meant "now" that Mavent has acquired the needed capital, not that Plaintiff would immediately receive the funds.  There is no evidence, and a reasonable jury could not conclude, that Pizante intended to defraud plaintiff in this regard.

24.  Plaintiff's fifth claim for negligent misrepresentation in inducing plaintiff to enter into the Agreement on January 30, 2006, or in returning to work in October 2006, fails as a matter of law because the undisputed facts establish that

1   plaintiff has no evidence that anyone at Mavent, in making the
2   alleged misrepresentations, lacked reasonable ground for believing
3   the alleged misrepresentations to be true.  For the same reasons
4   stated above, this claim fails as to plaintiff's argument that
5   defendants negligently misrepresented to him that he would be paid
6   his signing bonus and unpaid adjusted salary.

7   **E.        Sixth Claim for Defamation *Per Se***

8          25.  "Defamation constitutes an injury to reputation; the
9   injury may occur by means of libel or slander."  <u>Shively v.</u>
10  <u>Bozanich</u>, 80 P.3d 676, 682 (Cal. 2003).  "Defamation *per se* occurs
11  when a statement[] is defamatory on its face[] that is untrue.  A
12  defamation *per se* claim is actionable without proof of special
13  damages."  <u>Yow v. National Enquirer, Inc.</u>, 550 F. Supp. 2d 1179,
14  1183 (E.D. Cal. 2008).

15         26.  "A libel which is defamatory of the plaintiff
16  without the necessity of explanatory matter, such as an inducement,
17  innuendo or other extrinsic fact, is said to be a libel on its
18  face."  Cal. Civ. Code § 45a; <u>see also</u> <u>Barnes-Hind, Inc. v.</u>
19  <u>Superior Court</u>, 181 Cal. App. 3d 377, 385 (1986) ("The test is
20  whether a defamatory meaning appears from the language itself
21  without the necessity of explanation or the pleading of extrinsic
22  facts.").

23         27.  A slanderous communication, among other things,
24  "[t]ends directly to injure [plaintiff] in respect to his office,
25  profession, trade, or business, either by imputing to him general
26  disqualification in those respects which the office or other
27  occupation peculiarly requires, or by imputing something with
28  reference to his office, profession, trade, or business that has a

                                    42

1   natural tendency to lessen its profits." Cal. Civ. Code § 46(c).

2       28.   Plaintiff cannot succeed on his defamation claims if

3   the allegedly defamatory publications are privileged. A privileged

4   publication is one made "[i]n a communication, without malice, to a

5   person interested therein, (1) by one who is also interested, or

6   (2) by one who stands in such a relation to the person interested

7   as to afford a reasonable ground for supposing the motive for the

8   communication to be innocent, or (3) who is requested by the person

9   interested to give the information." Cal. Civ. Code § 47.

10      29.   "Communications made in a commercial setting

11   relating to the conduct of an employee have been held to fall

12   squarely within the qualified privilege for communications to

13   interested persons. . . . [A]n employer may publish to his

14   employees the reasons for termination of another employee, the

15   rationale for the publication being the employer's economic

16   interest in clarifying its policies and preventing future abuses of

17   those policies." Cuenca v. Safeway San Francisco Employees Fed.

18   Credit Union, 180 Cal. App. 3d 985, 995-96 (1986) (citing Deaile v.

19   General Telephone Co., 40 Cal. App. 3d 841, 849 (1974)); see also

20   King v. United Parcel Service, Inc., 152 Cal. App. 4th 426 (2007).

21   The conditional privilege applies to parties who share "a common

22   business or professional interest" with the employer. See Kashian

23   v. Harriman, 98 Cal. App. 4th 892, 930-31 (2002).

24      30.   Plaintiff's sixth claim for defamation fails as a

25   matter of law because the undisputed facts establish that the

26   allegedly defamatory statements were largely exchanged among

27   defendants' board members and management and, as such, are

28   conditionally privileged. Additionally, the claim fails as a

matter of law because the undisputed facts show:

(a)  The allegedly defamatory statements, in addition to being privileged, also constitute opinions.  See Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596 (1976) (stating that an essential element of defamation "is that the publication in question must contain a false statement of *fact*" (emphasis in original)).  This is true of comments that plaintiff was "old school," "stupid," "embarrassing," "the wrong guy for the job," and "dangerous."  To the extent that plaintiff argues these comments were driven by malice, he has failed to produce any evidence in this regard.  The statements are not attributed to specific persons by name, nor is there evidence the statements were published to uninterested persons.

(b)  One of the allegedly defamatory statements was made by a third party, Mike Issa, and not defendants.  See Matson v. Dvorak, 40 Cal. App. 4th 539, (1995) ("The general rule for defamation is that only one 'who takes a responsible part in the publication is liable for the defamation.'"  (quoting Osmond v. EWAP, Inc., 153 Cal. App. 3d 842, 852 (1984) (emphasis omitted)).

(c)  Certain allegedly defamatory statements are not defamatory because they are true.  See Raghavan v. Boeing Co., 133 Cal. App. 4th 1120, 1132 (2005) ("In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose.").  The statements to other employees – and to Meyerson – that plaintiff was placed on administrate leave and then terminated were true statements.  Plaintiff's bare speculation regarding how defendants'

1  employees or Meyerson might have interpreted these true statements

2  do not support a claim for defamation.

3        31.   The aforementioned conditional privilege is

4  extinguished where there is evidence of malice.   <u>See</u> Cal. Civ. Code

5  § 47.   The statement for which plaintiff specifically makes a

6  malice argument relates to Pizante's telling ISO that plaintiff

7  "inadvertently" disclosed confidential documents.   Plaintiff claims

8  the statement is defamatory because he had authority to send the

9  documents in question and Pizante would have known this had he

10 conducted an adequate investigation.   Pizante merely described the

11 disclosure as an oversight "by Mavent."   No reasonable jury could

12 conclude Pizante's statement was driven by malice.

13 **F.        Seventh Claim for Unfair Competition under California**

14 **           Business & Professions Code § 17200**

15       32.   California Bus. & Prof. Code § 17200 ("UCL")

16 prohibits unlawful, unfair or fraudulent business practices.

17 <u>People ex rel. Bill Lockyer v. Fremont Life Ins. Co.</u>, 104 Cal. App.

18 4th 508, 515 (2002).   "While an employer's policy or practice that

19 violates the Labor Code may also be held an 'unlawful business

20 practice' under Business and Professions Code 17200 et seq., where

21 . . . an employer's policy is lawful and permissible, there is no

22 basis for relief under the unfair competition law."   <u>Steinhebel v.</u>

23 <u>Los Angeles Times Comm.</u>, 126 Cal. App. 4th 696, 712 (2005).

24       33.   Plaintiff's seventh claim fails, insofar as the

25 unfair, unlawful, or fraudulent business practices alleged relate

26 to nonpayment of performance bonuses or other claims adjudicated in

27 this motion, since the Court has determined plaintiff is not

28 entitled to recovery on such bases.

**G.      Accounting**

34.   Plaintiff's request for an accounting fails insofar as it relates to nonpayment of performance bonuses, since the Court has determined plaintiff is not entitled to recovery on such basis.

**H.      Attorney's Fees**

35.   "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties."  Cal. Civ. P. § 1021.

36.   Plaintiff's prayer for attorneys' fees in the first claim for breach of contract fails as a matter of law because the contract does not provide for an award of attorney's fees. Plaintiff's argument that the bonuses should be considered wages under Cal. Labor Code § 218.5 is unavailing, since bonuses are not considered wages unless the contingencies for the awarding of such bonuses have been established and met.  See Neisendorf, 143 Cal. App. 4th at 522 ("[B]onuses are considered 'wages' within the meaning of Labor Code section 200. . . .  [O]nce a bonus has been promised as part of the compensation for service, and the employee fulfills all agreed-to conditions, the promised bonus is considered wages that must be paid.").  For the foregoing reasons, the bonus conditions were not established and thus could not have been met. Attorney's fees are, therefore, not recoverable.

37.   Plaintiff's prayer for attorney's fees as to his third claim for violation of Labor Code §§ 201, 208 fails as a matter of law because Cal. Labor Code § 218.5 does not authorize attorney's fees for actions to recover penalties.  The section limits award of attorney's fees to actions to acquire unpaid wages,

not penalties.  See Murphy v. Kenneth Cole Productions, 40 Cal. 4th 1094, 1103-1104, 1108-1109 (2007) (drawing distinction between "penalties" and "wages" in the Cal. Labor Code and the statutory rights that obtain under each).

38.  Plaintiff's prayer for attorney's fees in his seventh claim under California Business and Professions Code § 17200 fails because, as plaintiff concedes, the statute does not provide for attorney's fees.  See Walker v. Countrywide Home Loans, Inc., 98 Cal. App. 4th 1158 (2002) (stating § 17200 "does not provide for attorney fees, and relief is generally limited to injunctive relief and restitution").

39.  Plaintiff's prayer for attorney's fees in his tenth claim for an accounting also fails because the there is no contract or statute authorizing recovery of fees.  See Cal. Civ. P. § 1021.

I.       Stock Options

40.  Plaintiff's prayer for stock options fails as a matter of law because the undisputed facts establish that the right to exercise the stock options expired.

41.  The stock options agreements should be interpreted in accordance with contract principles.  See Falkowski v. Imation Corp., 132 Cal. App. 4th 499, 505 (2005).  "When faced with a dispute over the meaning of a contractual provision, the court must first determine whether the provision is ambiguous, i.e., whether, on its face, the language of the provision is capable of different, yet reasonable interpretations."  Id.  The language of the agreements in this case is clear.  Plaintiff entered into the stock options agreements knowing that he would have to exercise his rights under the agreements within three months of his employment's

1  cessation, regardless of the reason, with the only exceptions

2  enumerated being for death, disability, or retirement.  The stock

3  options agreements were inclusive of the possibility that plaintiff

4  might be terminated, with or without good cause.

5                         **IV.**

6                    **<u>CONCLUSION</u>**

7         The undisputed facts and conclusions of law uphold

8  defendant's Motion for Partial Summary Judgment.  Defendants'

9  proposed Order shall be modified and entered.

10

11        DATED:  July 21, 2008.

12                     ALICEMARIE H. STOTLER

13                    _____

14                     ALICEMARIE H. STOTLER
                          CHIEF U.S. DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28